**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| NICOLE KRITZER, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, THE UNIVERSITY OF NORTH CAROLINA HOSPITALS AT CHAPEL HILL, and THE UNIVERSITY OF NORTH CAROLINA HEALTH CARE SYSTEM,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Nicole Kritzer ("Plaintiff"), individually and on behalf of all others similarly situated, through the undersigned counsel, hereby alleges the following against the University of North Carolina at Chapel Hill ("the University"), the University of North Carolina Hospitals at Chapel Hill ("UNC Hospitals"), and the University of North Carolina Health Care System ("UNC Health") (collectively, "Defendants"). Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiff specifically alleges as follows:

## NATURE OF THE ACTION

1. This class action arises out of Defendants' failures to properly secure, safeguard, encrypt, and/or timely and adequately destroy Plaintiff's and Class Members' sensitive personally identifiable information that it had acquired and stored for its business purposes.

2. Defendants' data security failures allowed a targeted cyberattack to take place on or around July 24, 2025, to compromise Defendants' network (the "Data Breach") that contained personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Private Information"). According to the notice Plaintiff received in the mail ("the Notice"), the types of personal data exposed included names, dates of birth, and diagnosis and treatment information.[1] According to the University's website, other types of personal data exposed may include driver's license numbers, Social Security numbers, financial account information, or health insurance identification numbers.[2]

3. Defendants learned of the Data Breach on or around July 24, 2025, and determined that Class Members' Private Information had been compromised. Yet, Defendants unreasonably delayed notifying affected persons, failing to begin issuing its Notice of Data Breach letters until September 19, 2025.[3]

4. On its computer network, Defendants hold and store certain highly sensitive PII of Plaintiff and the putative Class Members, individuals who provided their highly sensitive and private information in exchange for healthcare services.

5. As a result of Defendants' Data Breach, Plaintiff and thousands of Class members suffered ascertainable losses in the form of financial losses resulting from identity theft, out-of-pocket expenses, the loss of the benefit of their bargain, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.

---

[1] *See* Plaintiff's Notice Letter, Exhibit 1. The Notice was addressed to Nicole Barillari, Plaintiff's maiden name. Plaintiff's married name is Nicole Kritzer and is the name used by Plaintiff throughout this Complaint.
[2] *Notice of a Data Security Incident*, UNC SCHOOL OF MEDICINE (Sept. 19. 2025), https://www.med.unc.edu/press-release/notice-of-a-data-security-incident-9-19-2025/.
[3] Plaintiff's Notice Letter, Exhibit 1.

6. In addition, Plaintiff's and Class Members' highly sensitive Personal Information, which was entrusted to Defendants, was compromised, unlawfully accessed, and exfiltrated as a result of the Data Breach.

7. Based upon the Notice, the Data Breach was caused by a faculty member at the University's School of Medicine, who clicked on a malicious phishing hyperlink and then approved the multifactor authentication code allowing the cybercriminal to access their University email account.

8. The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect Plaintiff and Class Members' Private Information.

9. Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendants' inadequate safeguarding of Class members' Private Information that they collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

10. Defendants maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendants' computer network in a condition vulnerable to cyberattacks. The mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendants. Thus, Defendants were on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

11. Defendants disregarded the privacy and property rights of Plaintiff and Class members by, inter alia, intentionally, willfully, recklessly, or negligently failing to take adequate

and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust systems and security practices to safeguard Class members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class members prompt, accurate, and complete notice of the Data Breach.

12. In addition, Defendants and their employees failed to properly monitor the computer network and systems that housed the Private Information. Had Defendants properly monitored their computer network and systems, it would have discovered the intrusion sooner and potentially been able to mitigate the injuries to Plaintiff and the Class.

13. Plaintiff's and Class Members' identities are now at substantial and imminent risk because of Defendants' negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

14. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, e.g., opening new financial accounts in Class members' names, taking out loans in Class members' names, using Class members' information to obtain government benefits, filing fraudulent tax returns using Class members' information, filing false medical claims using Class members' information, obtaining driver's licenses in Class members' names with another person's photograph, and giving false information to police during an arrest.

15. As a result of the Data Breach, Plaintiff and Class members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class members must now and in the future closely monitor their financial accounts to guard against identity theft.

16. Plaintiff and Class members may also incur out-of-pocket expenses for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

17. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed during the Data Breach (the "Class").

18. Accordingly, Plaintiff brings this action against Defendants for breach of express contract, seeking redress for Defendant's unlawful conduct.

19. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket expenses, and injunctive relief, including improvements to Defendants' data security systems, future annual audits, and adequate, long-term credit monitoring services funded by Defendants, and declaratory relief.

## PARTIES

**Plaintiff Nicole Kritzer**

20. Plaintiff Nicole Kritzer is and at all times relevant to this Complaint an individual citizen in the state of North Carolina, residing in the city of Raleigh. Plaintiff Kritzer has been a patient of UNC Hospitals since at least 2008.

**Defendant University of North Carolina at Chapel Hill**

21. Defendant University of North Carolina at Chapel Hill ("the University") is a public university located at 250 E. Franklin St., Chapel Hill, North Carolina 27514. The University can be served through its registered agent Paul Newton at the Office of University Counsel, Campus Box 9105, 123 W. Franklin St., Suite 600A, Chapel Hill, North Carolina, 27599-9105.

**Defendant University of North Carolina Hospitals at Chapel Hill**

22. Defendant University of North Carolina Hospitals at Chapel Hill ("UNC Hospitals") is a located at 101 Manning Drive, Chapel Hill, North Carolina, 27514. UNC Hospitals is a component unit of UNC Health pursuant to N.C.G.S. § 116-350. UNC Hospitals' Terms and Conditions state that "[p]rocess in any action or proceeding . . . may be served on any party anywhere in the world."[4]

**Defendant University of North Carolina Health Care System**

23. Defendant UNC Health is located at 101 Manning Drive, Chapel Hill, North Carolina, 27514. UNC Health is an integrated health care system established by statute. N.C.G.S. § 116-350.5

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the putative Class, and at least one member of the Class is a citizen of a state different from Defendant.

25. The Court has general personal jurisdiction over Defendants because, personally or through its agents, Defendants operate, conduct, engage in, or carry on a business in North Carolina; they maintain their headquarters in North Carolina; and committed tortious acts in North Carolina.

---

[4] *Terms and Conditions of Website Use*, UNC HEALTH, available at https://www.uncmedicalcenter.org/app/files/public/37e972c1-d9ba-4a00-a998-7699f14c4cb7/pdf-system-unc-health-websites-terms-and-conditions.pdf (last updated December 2, 2022).

26. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district within which Defendant has the most significant contacts and because a substantial portion of the acts and omissions that give rise to the claims herein occurred in this district.

## FACTS

27. The University is a public university with 20,885 undergraduate students and 11,553 graduate and professional students.[5] As part of its status as a university, the University was entrusted with, and obligated to safeguard and protect, the Private Information of Plaintiff and the Class in accordance with all applicable law and industry standards.

28. In its Privacy Statement, the University promises that its security is "designed to maintain data confidentiality, integrity, and an appropriate level of availability."[6]

29. UNC Hospitals consists of multiple facilities providing health care to over 37,000 people per year.[7] UNC Hospitals has a staff of more than 7,100 employees who "strive to provide high quality patient care, to educate health care professionals, to advance research and to provide community service."[8] It is legally and operationally part of the University of North Carolina system. As a healthcare provider, UNC Hospitals collects and stores highly sensitive PHI about individuals on its computer systems. This PHI requires UNC Hospitals to adhere to the laws, rules, and regulations of the Health Insurance Portability and Accountability Act ("HIPAA").

30. UNC Hospitals acknowledges in its Notice of Privacy Practices that it is "required by law to maintain the privacy of your protected health information, to provide you with notice of

---

[5] *By the Numbers*, THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, https://www.unc.edu/about/by-the-numbers/ (last visited Nov. 5, 2025).
[6] *Privacy Information*, THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, https://www.unc.edu/about/privacy-statement/#chapter-7 (last visited Nov. 6, 2025).
[7] *About Us*, UNC HEALTH, https://www.uncmedicalcenter.org/uncmc/about/ (last visited Nov. 5, 2025).
[8] *Id*.

our legal duties and privacy practices with respect to protected health information, and to abide by the terms of this Notice as currently in effect."[9]

31. Patients provide their Private Information to Defendants with the mutual understanding that this highly sensitive information was confidential and would be properly safeguarded from misuse and theft.

32. In the course of collecting Private Information from consumers, including Plaintiff and Class members, Defendants promised to provide confidentiality and adequate security for Private Information through their legal obligations to be in compliance with statutory privacy requirements applicable to their respective industries. Defendants are aware of and have obligations created by HIPAA, the Federal Trade Commission Act ("FTCA"), contract, industry standards, and common law to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

33. Consumers, in general, demand that businesses that require highly sensitive Private Information provide adequate security to safeguard that information.

34. Defendants had a duty to adopt reasonable measures to protect Plaintiff's and Class Members' PII and PHI from unauthorized disclosure to third parties.

***The Data Breach***

35. On or around September 19, 2025, Plaintiff received a Notice from the University and UNC Hospitals stating that on or around July 24, 2025, they learned that "an unauthorized person may have gained access to the email account for a faculty member at the University's

---

[9] *Joint Notice of Privacy Practices of the University of North Carolina Health Care System Organized Health Care Arrangement*, UNC HEALTH, available at https://www.uncmedicalcenter.org/app/files/public/de5cc2bb-4fe8-4218-9648-75a9889abedd/Notice-of-Privacy-Practice.pdf (last visited Nov. 6, 2025). *See also* Exhibit 2, Plaintiff's signed acknowledgment of UNC Hospital's Notice of Privacy Practices.

School of Medicine ("SOM")."[10] The Notice stated that the faculty member "fell victim to a sophisticated social engineering attack by clicking on a malicious phishing hyperlink received from a known and trusted contact."

36. Plaintiff's and Class Members' Private Information was in the hands of cybercriminals for approximately two months before they were notified of the Data Breach. Time is of the essence when trying to protect against identity theft after a data breach, so early notification is critical.

37. Because of this targeted, intentional cyberattack, data thieves were able to gain access to and obtain data from Defendants that included the Private Information of Plaintiff and Class Members.

38. Upon information and belief, the Private Information stored on Defendants' network was not encrypted.

39. Plaintiff's Private Information was accessed and stolen in the Data Breach. Plaintiff reasonably believes her stolen Private Information is currently available for sale on the dark web because that is the *modus operandi* of cybercriminals who target businesses that collect highly sensitive Private Information.

40. Plaintiff's Notice stated that her name, date of birth, and diagnosis and treatment information may have been compromised in the Data Breach.[11] The Notice states that her Social Security number, financial account information, driver's license number, or health insurance identification number was not included in the email account that was breached.[12] Because of that, Defendants did not offer Plaintiff any free credit monitoring services. They did, however, state

[10] Plaintiff's Notice Letter, Exhibit 1.
[11] *Id.*
[12] *Id.*

that Plaintiff "should remain vigilant for incidents of fraud and identity theft by reviewing credit card account statements and monitoring [her] credit report for unauthorized activity."

41. In the Notice of Data Security Incident posted on UNC Hospitals' website, it states that "The University is offering credit monitoring services to all impacted individuals whose Driver's License number, Social Security number, financial account information or health insurance identification number was potentially in scope."[13]

42. That Defendants are encouraging Plaintiff and Class Members to review their credit reports, and in some cases offering Class members' credit monitoring services, is an acknowledgment that the impacted consumers are subject to a substantial and imminent threat of fraud and identity theft.

43. Plaintiff does not trust Defendants' determination that other highly sensitive Private Information, including those listed above, were not included in the Breach.

44. Defendants had obligations created by contract, industry standards, and common law to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

45. Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting its equipment and computer files containing Personal Information.

***Defendants Acquire, Collect, and Store Plaintiff's and Class Members' Private Information***

46. Defendants acquire, collect, and store a massive amount of Private Information from whom they are providing employment and healthcare services for their patients.

---

[13] *Notice of a Data Security Incident*, UNC SCHOOL OF MEDICINE (Sept. 19. 2025), https://www.med.unc.edu/press-release/notice-of-a-data-security-incident-9-19-2025/.

47. By obtaining, collecting, and using Plaintiff's and Class Members' PII for its own financial gain and business purposes, Defendants assumed legal and equitable duties and knew that they were responsible for protecting Plaintiff's and Class Members' PII from disclosure.

48. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

49. Plaintiff and Class Members relied on Defendants to keep their PII and PHI confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***The Data Breach was a Foreseeable Risk for which Defendants Were on Notice***

50. It is well known that PII, particularly Social Security numbers, is a valuable commodity and a frequent, intentional target of cybercriminals. Companies that collect such information, including Defendants, are well aware of the risk of being targeted by cybercriminals.

51. Individuals place a high value not only on their PII, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, including severe distress and hours of lost time trying to fight against the impact of identity theft.

52. A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[14]

[14] Erika Harrell, *Victims of Identity Theft*, 2018, U.S. DEPARTMENT OF JUSTICE BULLETIN at 9 (Apr. 2021), https://bjs.ojp.gov/document/vit18.pdf.

53. Individuals, like Plaintiff and Class members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and are likened to accessing your DNA for hacker's purposes.

54. Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiff and Class members cannot obtain new numbers unless they become a victim of Social Security number misuse.

55. The Social Security Administration has warned that obtaining a new Social Security number will not alleviate all risks of identity theft. This is because:

> [O]ther governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.[15]

56. In 2024, there were 3,158 data breaches recorded, similar to the 3,205 breaches reported in 2023. However, the number of victims affected jumped to 1.35 billion people, a 211% increase from 2023 to 2024.[16]

57. Additionally, "in 2024, healthcare data breaches reached an all-time high, with 276,775,457 records compromised – a 64.1% increase from the previous year's record and equivalent to 81.38% of the United States population."[17] A report issued by Ivanti interviewed

---

[15] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION PUB. NO. 05-10064 at 6 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[16] *Identity Theft Resource Center's 2024 Annual Data Breach Report Reveals Near-Record Number of Compromises and Victim Notices*, IDENTITY THEFT RESOURCE CENTER (Jan. 28, 2025), https://www.idtheftcenter.org/post/2024-annual-data-breach-report-near-record-compromises/.

[17] Chuck Brooks, *Key Cybersecurity Challenges in 2025—Trends and Observations*, FORBES (Apr. 5, 2025), https://www.forbes.com/sites/chuckbrooks/2025/04/05/key-cybersecurity-challenges-in-2025-trends-and-observations/.

"more than 2,400 security leaders and found that the top predicted threat for 2025 is ransomware. According to the report, nearly 1 out of every 3 security professionals (38%) believe ransomware will become an even greater threat when powered by AI."[18] This is particularly alarming as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from businesses with a "lack of cybersecurity expertise and significant security resources."[19]

58. In light of high profile data breaches at other industry leading companies, including Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that their computer network would be targeted by cybercriminals.

59. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, prepared for, and hopefully can ward off a cyberattack. According to an FBI publication, "[r]ansomware is a type of malicious software—or malware—that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."[20] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't

---

[18] *Id.*
[19] *Id.*
[20] *Ransomware*, FEDERAL BUREAU OF INVESTIGATION, https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/ransomware (last visited Oct. 6, 2025).

guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[21]

60. Despite the prevalence of public announcements of data breach and data security compromises, its own acknowledgments of data security compromises, and its own acknowledgment of its duties to keep PII private and secure, Defendants failed to take appropriate steps to protect the PII of Plaintiff and the proposed Class from being compromised.

***At All Relevant Times, Defendants Had a Duty to Plaintiff and Class Members to Properly Secure Their Private Information***

61. At all relevant times, Defendants had a duty to Plaintiff and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiff and Class members, and to promptly notify Plaintiff and Class Members when Defendants became aware that their PII was compromised.

62. Defendants had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Defendants breached their common law, statutory, and other duties owed to Plaintiff and Class Members.

63. Security standards commonly accepted among businesses that store PII using the Internet include, without limitation:

a. Maintaining a secure firewall configuration;

b. Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

c. Monitoring for suspicious or irregular traffic to servers;

[21] *Id.*

d. Monitoring for suspicious credentials used to access servers;

e. Monitoring for suspicious or irregular activity by known users;

f. Monitoring for suspicious or unknown users;

g. Monitoring for suspicious or irregular server requests;

h. Monitoring for server requests for PHI;

i. Monitoring for server requests from VPNs; and

j. Monitoring for server requests from Tor Exit Nodes.

64. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[22] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[23]

65. The ramifications of Defendants' failure to keep consumers' PII secure are long-lasting and severe. Once PII is stolen, particularly Social Security and driver's license numbers, fraudulent use of that information and damage to victims including Plaintiff and the Class may continue for years.

***The Value of Personally Identifiable Information***

66. The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay for it through the dark web. Numerous sources cite dark web pricing for stolen

[22] 17 C.F.R. § 248.201(b)(9).
[23] 17 C.F.R. § 248.201(b)(8).

identity credentials. For example, personal information can be sold at a price ranging from $40 to $200.[24]

67. Criminals can also purchase access to entire company's data breaches from $900 to $4,500.[25]

68. Social Security numbers are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> Scammers use your Social Security number (SSN) to get other personal information about you. They can use your SSN and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your SSN until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought.[26]

69. Attempting to change or cancel a stolen Social Security number is difficult, if not nearly impossible. An individual cannot obtain a new Social Security number without evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

---

[24] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[25] *In the Dark*, VPN OVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 6, 2025).

[26] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION PUB. NO. 05-10064 at 1 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

70. Even a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[27]

71. This data, as one would expect, demands a much higher price on the black market. Martin Walter, Senior Director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[28]

72. PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[29]

73. Given the nature of this Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Class members' PII can easily obtain Class members' tax returns or open fraudulent credit card accounts in Class members' names.

74. The Private Information compromised in this Data Breach is static and difficult, if not impossible, to change (such as Social Security numbers).

---

[27] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[28] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[29] *Memorandum from Clay Johnson III, Deputy Director for Management, Office of Management and Budget, on Safeguarding Against and Responding to the Breach of Personally Identifiable Information*, n.1 (May 22, 2007), *available at* https://whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/memoranda/2007/m07-16.pdf.

75. Defendants' credit monitoring offer and advice included in the Notice squarely place the burden on Plaintiff and Class members, rather than on Defendants, to monitor and report suspicious activities to law enforcement. In other words, Defendants expect Plaintiff and Class Members to protect themselves from its tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiff and Class members in credit monitoring services upon discovery of the Data Breach, Defendants merely sent instructions to Plaintiff and Class members about actions they can take to retroactively protect themselves.

76. These credit monitoring services, offered only to some members of the Class, are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. They also entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiff's and Class members' PII.

77. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the victims of its Data Breach.

***UNC Hospitals Failed to Comply with HIPAA***

78. Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[30]

79. Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

---

[30] 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

80. HIPAA's Privacy Rule broadly defines protected health information ("PHI") as individually identifiable health information ("IIHI") that is "(i) transmitted by electronic media; (ii) maintained in electronic media; or (iii) transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

81. IIHI is defined as "a subset of health information, ***including demographic information collected from an individual***" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103 (emphasis added).

82. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

> A. Names;
>
> …
>
> H. Medical record numbers;
>
> …
>
> J. Account numbers;

…

M. Device identifiers and serial numbers;

N. Web Universal Resource Locators (URLs);

O. Internet Protocol (IP) address numbers;

… and

R. Any other unique identifying number, characteristic, or code…

45 C.F.R. § 164.514. Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

83. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

84. Even the fact that an individual is receiving a medical service, i.e., is a patient of a particular entity, can be PHI. The Department of Health and Human Services ("HHS") has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[31]

[31] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Oct. 8, 2025).

85. Consistent with this restriction, the HHS has issued marketing guidance that provides,

> With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list.[32]

86. Here, UNC Hospitals provided patient information to third parties in violation of the Privacy Rule.

87. HIPAA also requires UNC Hospitals to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

88. UNC Hospitals further failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that UNC Hospitals created, received, maintained, and transmitted in violation of 45 C.F.R. section 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to UNC Hospitals in violation of 45 C.F.R. section 164.308(a)(6)(ii);

---

[32] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Oct. 8, 2025).

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. section 164.306(a)(2);

e. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. section 164.306(a)(3); and

f. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

***Defendants Failed to Comply with FTC Guidelines***

89. Federal and state governments have established security standards and issued recommendations to mitigate the risk of data breaches and the resulting harm to consumers and financial institutions. The FTC has issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[33]

90. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[34] The guidelines note businesses should protect the personal consumer information that they keep, as well as properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.

[33] *Start with Security*, FEDERAL TRADE COMMISSION (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[34] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business-0 (last visited Oct. 6, 2025).

91. The FTC emphasizes that early notification to data breach victims reduces injuries, stating that "[i]f you quickly notify people that their personal information has been compromised, they can take steps to reduce the chance that their information will be misused" and "thieves who have stolen names and Social Security numbers can use that information not only to sign up for new accounts in the victim's name, but also to commit tax identity theft. People who are notified early can take steps to limit the damage."[35]

92. The FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[36]

93. The FTC recommends that businesses[37]:

a. Identify all connections to the computers where you store sensitive information.

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c. Do not store sensitive consumer data on any computer with an Internet connection unless it is essential for conducting their business.

d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an Internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

---

[35] *Data Breach Response: A Guide for Business*, FEDERAL TRADE COMMISSION (Aug. 2023), https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business (last visited Oct. 6, 2025).
[36] *See Start with Security, supra* note 33, at 11.
[37] *See Protecting Personal Information, supra* note 34.

e. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks.

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the Internet.

g. Determine whether a border firewall should be installed where the business' network connects to the Internet. A border firewall separates the network from the Internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

94. The FTC has brought enforcement actions against businesses for failing to protect consumer and consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as

an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

95. Because Class Members entrusted Defendants with their PII, Defendants had, and continue to have, a duty to Plaintiff and the Class to keep their PII secure.

96. Plaintiff and Class members reasonably expected that when they provided PII to Defendants (or to Defendants' customers), Defendants would safeguard their PII.

97. Defendants were at all times fully aware of their obligation to protect the personal and financial data of consumers, including Plaintiff and Members of the Class. Defendants were also aware of the significant repercussions if they failed to do so.

98. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—including Plaintiff's and Class members' first names, last names, addresses, and Social Security numbers, and other highly sensitive and confidential information—constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Concrete Injuries Were Caused by Defendant's Inadequate Security***

99. Plaintiff and Class members reasonably expected that Defendants would provide adequate security protections for their PII, and Class members provided Defendants with sensitive personal information, including their names, addresses, and Social Security numbers.

100. Defendants' poor data security deprived Plaintiff and Class members of the benefit of their bargain. Plaintiff and other individuals whose PII was entrusted with Defendants understood and expected that, as part of that business relationship, they would receive data

security, when in fact Defendants did not provide the expected data security. Accordingly, Plaintiff and Class members received data security that was of a lesser value than what they reasonably expected. As such, Plaintiff and the Class members suffered pecuniary injury.

101. Cybercriminals intentionally attack and exfiltrate PII to exploit it. Thus, Class members are now, and for the rest of their lives will be, at a heightened and substantial risk of identity theft. Plaintiff and Class members have also incurred (and will continue to incur) damages in the form of, inter alia, loss of privacy and costs of engaging adequate credit monitoring and identity theft protection services.

102. The cybercriminals who obtained the Class Members' PII may exploit the information they obtained by selling the data in so-called "dark markets" or on the "dark web." Having obtained these names, addresses, Social Security numbers, and other PII, cybercriminals can pair the data with other available information to commit a broad range of fraud in a Class Member's name, including but not limited to:

a. Obtaining employment;

b. Obtaining a loan;

c. Applying for credit cards or spending money;

d. Filing false tax returns;

e. Stealing Social Security and other government benefits; and

f. Applying for a driver's license, birth certificate, or other public document.

103. In addition, if a Class Member's Social Security number is used to create false identification for someone who commits a crime, the Class member may become entangled in the criminal justice system, impairing the person's ability to gain employment or obtain a loan.

104. As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff and the other Class members have been deprived of the value of their PII, for which there is a well-established national and international market.

105. Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for fraudulent misuse of this information to be detected.

106. Accordingly, Defendants' wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the other Class members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud. Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class members' PII will do so at a later date or re-sell it.

107. As a result of the Data Breach, Plaintiff and Class Members have already suffered injuries, and each are at risk of a substantial and imminent risk of future identity theft.

***Data Breaches Put Consumers at an Increased Risk of Fraud and Identity Theft***

108. Data breaches, such as the one experienced by Plaintiff and the Class, are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

109. In 2019, the U.S. Government Accountability Office released a report addressing the steps consumers can take after a data breach.[38] Its appendix of steps consumers should consider,

---

[38] *Data Breaches: Range of Consumer Risks Highlights Limitations of Identity Theft Services*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE, Report No. GAO-19-230 (Mar. 2019) at 37-41, *available at* https://www.gao.gov/assets/gao-19-230.pdf (last visited Oct. 6, 2025).

in simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options.[39] It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and the Class) must take after a breach like Defendants' are both time-consuming and of only limited and short-term effectiveness.

110. The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[40]

111. It must also be noted that there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[41]

---

[39] *Id.*

[40] *Identity Theft*, FEDERAL TRADE COMMISSION, https://consumer.ftc.gov/identity-theft-and-online-security/identity-theft (last visited Oct. 6, 2025).

[41] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE, Report No. GAO-07-737 (June 2007) at 29, *available at* https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 6, 2025).

112. Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

113. There is a strong probability that the entirety of the stolen information has been dumped on the dark web or will be dumped on the dark web, meaning Plaintiff and Class members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class members must vigilantly monitor their financial and medical accounts for many years to come.

114. As the HHS warns, "PHI can be exceptionally valuable when stolen and sold on a black market, as it often is. PHI, once acquired by an unauthorized individual, can be exploited via extortion, fraud, identity theft and data laundering. At least one study has identified the value of a PHI record at $1000 each."[42]

***Plaintiff Kritzer's Experience***

115. Plaintiff Nicole Kritzer is, and at all times relevant to this Complaint, a resident and citizen of the state of North Carolina.

116. Plaintiff Kritzer has been a patient of UNC Hospitals since at least 2008. A lot of the physicians that Plaintiff Kritzer sees are through UNC Hospitals. To receive services from UNC Hospitals, it required that Plaintiff Kritzer provide them with her PII and PHI. Defendants were therefore provided with her Personal Information.

---

[42] *A Cost Analysis of Healthcare Sector Data Breaches*, DEPARTMENT OF HEALTH & HUMAN SERVICES (Apr. 12, 2019), at 2, *available at* https://www.hhs.gov/sites/default/files/cost-analysis-of-healthcare-sector-data-breaches.pdf (last visited Oct. 6, 2025).

117. On or around September 19, 2025, Plaintiff Kritzer received the Notice, which indicated that Defendants had known about the Data Breach for approximately two months. The Notice informed her that her critical Private Information was accessed by an unauthorized actor. The Notice stated that the extracted information included her name, date of birth, and diagnosis and treatment information.[43] In the Notice of Data Security Incident posted on UNC Hospitals' website, it states that other patient information that could have been exposed to the cybercriminals included "Driver's License number[s], Social Security number[s], financial account information or health insurance identification number[s]."[44]

118. Plaintiff Kritzer is alarmed by the amount of her Personal Information that was stolen or accessed, and even more by the fact that her highly sensitive PHI was identified as among the breached data.

119. In response to Defendants' Notice, Plaintiff has been and will continue to be required to spend time dealing with the consequences of the Data Breach, including time spent verifying the legitimacy of the Notice, exploring credit monitoring and identity theft insurance options, and self-monitoring her accounts.

120. Since the Data Breach, Plaintiff Kritzer has noticed an increase in spam calls and text messages. She receives approximately two to three spam calls every day.

121. On November 8, 2025, Plaintiff Kritzer received an email from Wells Fargo, her bank, alerting her to attempted fraud on her credit card.[45] The attempted fraud was in the amount of $29.99 from a vendor called GAMESFAN. Plaintiff Kritzer did not recognize or authorize this transaction. Wells Fargo declined the expense out of suspicion of fraud.

---

[43] Plaintiff's Notice Letter, Exhibit 1.
[44] *Notice of a Data Security Incident*, UNC SCHOOL OF MEDICINE (Sept. 19. 2025), https://www.med.unc.edu/press-release/notice-of-a-data-security-incident-9-19-2025/.
[45] *See* Exhibit 3.

122. Immediately after receiving the Notice, Plaintiff Kritzer has spent time evaluating her next steps including consulting with legal counsel, changing her passwords, getting her debit card reissued, and checking her financial accounts in an effort to mitigate the damage that has been caused by Defendants. Plaintiff Kritzer has spent approximately ten hours trying to mitigate the damage that has been caused by Defendants.

123. Plaintiff Kritzer is very careful about sharing PII and has never knowingly transmitted unencrypted PII over the Internet or any other unsecured source.

124. Plaintiff suffered actual injury and damages as a result of the Data Breach. Plaintiff would not have provided Defendants with her Private Information had Defendants disclosed that they lacked data security practices adequate to safeguard it.

125. Plaintiff Kritzer suffered actual injury in the form of damages and diminution in the value of her Private Information – a form of intangible property that she entrusted to Defendants.

126. Plaintiff suffered lost time, annoyance, interference, anxiety, and inconvenience as a result of the Data Breach, as well as increased concerns for the loss of her privacy, particularly as it relates to her PHI.

127. Plaintiff Kritzer reasonably believes that her Private Information may have already been sold to cybercriminals. Had she been notified of Defendants' Data Breach in a timely manner, she could have attempted to mitigate her injuries.

128. Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her stolen Private Information being placed in the hands of unauthorized third parties and possibly criminals.

129. Plaintiff has a continuing interest in ensuring that her Private Information, which upon information and belief remains backed up and in Defendants' possession, is protected and safeguarded from future breaches.

## **CLASS ACTION ALLEGATIONS**

130. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class").

131. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All individuals whose Private Information was compromised through the breach of the University's School of Medicine faculty member's email account on or around July 24, 2025.

132. Excluded from the Class are Defendants' officers and directors, and any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

133. Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

134. **Numerosity**. The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, based on information and belief, the Class consists of approximately thousands of people whose data was compromised in Data Breach.

135. **Commonality**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a. Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendants owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendants breached their duty to Class members to safeguard their Private Information;

g. Whether computer hackers obtained Class members' Private Information in the Data Breach;

h. Whether Defendants knew or should have known that its data security systems and monitoring processes were deficient;

i. Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

j. Whether Defendants' conduct was negligent;

k. Whether Defendants failed to provide notice of the Data Breach in a timely manner; and

l. Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

136. **Typicality**. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

137. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

138. **Predominance**. Defendants have engaged in a common course of conduct toward Plaintiff and Class members, in that all the Plaintiff's and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

139. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class members would likely find the cost of litigating their individual claims prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties,

conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

140. Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class wide basis.

141. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

b. Whether Defendants' security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

c. Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

d. Whether Defendants failed to take commercially reasonable steps to safeguard consumer Private Information;

e. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

142. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class members' names and addresses affected by the Data Breach. Class members have already been preliminarily identified and sent Notice of the Data Breach by Defendants.

## CAUSES OF ACTION

## COUNT I
**Breach of Express Contract**
**(On Behalf of Plaintiff and the Class)**

143. Plaintiff incorporates by reference the allegations above as if fully set forth herein.

144. Plaintiff and Class Members were required to provide their PII and PHI to Defendants as a condition of receiving other services provided by Defendants.

145. Plaintiff and Class Members provided their PII and PHI to Defendants in exchange for Defendants' services or employment. In exchange for the Private Information, Defendants promised to protect their PII and PHI from unauthorized disclosure.

146. Upon obtaining services from Defendants, Plaintiff and Class Members signed an acknowledgement of Defendants' Privacy Practices.

147. On information and belief, Defendants promised to comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

148. When Plaintiff and Class Members provided their Private Information to Defendants as a condition of relationship, they entered into express contracts with Defendants pursuant to which Defendants agreed to reasonably protect such information.

149. The express contract between Plaintiff and Class Members and Defendants to provide Private Information set forth the latters' obligation to:

a. Use such Private Information for business purposes only;

b. Take reasonable steps to safeguard that Private Information;

c. Prevent unauthorized disclosures of the Private Information;

d. Provide Plaintiff and Class members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information;

e. Reasonably safeguard and protect the Private Information of Plaintiff and Class members from unauthorized disclosure or uses; and

f. Retain the Private Information only under conditions that kept such information secure and confidential.

150. In entering into such express contracts, Plaintiff and Class members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

151. By providing their sensitive data to Defendants' business customers, Class Members entered into an express contract with the reasonable expectation that Defendants, as custodian of this information, would take adequate measures to protect it. The collection and storage of such highly sensitive information necessarily carries with it a duty to implement reasonable security safeguards, consistent with industry standards and legal obligations. Defendants' failure to prevent the Data Breach constitutes a breach of this express contractual obligation, directly harming Plaintiffs and the Class, who reasonably relied on Defendants' promises and practices to keep their information secure.

152. Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of the express contract between them and Defendants to keep their information reasonably secure. Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

153. Plaintiff and Class Members fully and adequately performed their obligations under the express contracts with Defendants.

154. Defendants breached their express contracts with Class Members by failing to safeguard and protect their Private Information.

155. As a direct and proximate result of Defendants' breach of the express contracts, Class Members sustained damages as alleged herein.

156. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

157. Plaintiff and Class Members are also entitled to nominal damages for the breach of express contract.

158. Plaintiff and Class members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate long term credit monitoring to ***all*** Class Members.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A. An Order certifying this action as a class action and appointing Plaintiff and their counsel to represent the Class;

B. Equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures of their Data Breach to Plaintiff and Class members;

C. Equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

D. Equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

E. Declaratory relief as requested;

F. Injunctive relief ordering Defendants to pay for lifetime credit monitoring services for Plaintiff and the Class;

G. An award of actual damages, compensatory damages, and statutory damages, in an amount to be determined, as allowable by law;

H. An award of attorneys' fees and costs, and any other expense, including expert witness fees;

I. Pre- and post-judgment interest on any amounts awarded; and

J. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Date: November 21, 2025.

Respectfully submitted,

*/s/ Matthew E. Lee*

Matthew E. Lee
Jeremy R. Williams
Eric G. Steber
**LEE SEGUI PLLC**
900 W Morgan St
Raleigh, NC 27603
855-496-7500
mlee@leesegui.com
jwilliams@leesegui.com
esteber@leesegui.com

Jason S. Rathod*
*jrathod@classlawdc.com*
Nicholas A. Migliaccio*
*nmigliaccio@classlawdc.com*
Migliaccio & Rathod LLP
412 H Street NE
Washington, DC 20002
Tel: (202) 470-3520
Fax: (202) 800-2730

**Pro hac vice anticipated*
*Counsel for Plaintiff*